**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

KAYLA WOODS,

                              Plaintiff,

              -against-

MEDISCA INC.,
LARRY HARNEY, KAYLA FRENYEA,
and KENDALL FENTON,

                              Defendants.

**Case No.**   8:22-cv-599 (GTS/CFH)

**COMPLAINT**

**JURY TRIAL DEMANDED**

Kayla Woods, by her attorneys Crumiller P.C., as and for her Complaint against Medisca Inc. ("Medisca" or the "Company"), Larry Harney, Kayla Frenyea, and Kendall Fenton, alleges as follows:

## NATURE OF ACTION

1.       Woods brings this action to remedy claims of gender discrimination and retaliation, sex-based hostile work environment, sexual harassment, and sexual assault she endured while employed at Medisca. Throughout her tenure, Woods was forced to endure a barrage of gender-based comments by two separate harassers with whom she shared her workspace. These comments included explicit details about their sex lives, offensive comments about women's bodies, sexual advances towards Woods, and obscene remarks regarding Woods's prior miscarriages. This chronic and unmitigated sexual harassment culminated in the sexual assault of Woods by Fenton in the workplace.

2.       Woods lodged several protected complaints of harassment to her supervisor, Frenyea, who refused to take any remedial action and responded by reprimanding Woods for raising complaints. When Woods's complaints were elevated to Medisca's Human Resources ("HR"), an HR representative told Woods that reporting her sexual assault was "in violation of

1

Medisca's Code of Conduct," and warned her that lodging any further protected complaints would "result in disciplinary action." In a meeting ostensibly held to discuss Woods's complaints, Harney, General Manager of US Operations, openly berated Woods for having the audacity to oppose the hostile work environment and terminated her employment in retaliation.

3.     Woods further brings this action to remedy claims arising from Medisca's unlawful interference and retaliation in violation of the Family Medical Leave Act. During her employment with Medisca, Woods's mother's health declined precipitously, and Woods was her sole caretaker. When she attempted to take FMLA leave in order to provide that care following her mother's surgery, Frenyea repeatedly shamed Woods for requesting such leave. Under duress, Woods postponed and adjusted her leave to accommodate Medisca's schedule. Eventually, Woods was able to take her leave, but less than one week into her leave, Medisca attempted to transfer Woods to a less desirable and lower paying position and terminated her on the day she returned from her protected leave.

4.     Woods claims violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., as amended by the Emergency Family and Medical Leave Expansion Act, 29 CFR 826, (expired Dec. 31, 2020); the New York State Human Rights Law, Executive Law § 296[1] ("NYSHRL"); false imprisonment; assault and battery.

## PARTIES

5.     Woods is an individual woman who is domiciled in Clinton County, New York. She was employed by Medisca from 2019 to 2021 in their Plattsburg location. Plaintiff was an eligible employee as that term is defined under the applicable statutes.

6.     Medisca is a domestic business corporation with its primary place of business located at 661 State Route 3, Plattsburgh, NY 12901.  Medisca is engaged in the business of

importing and distributing drugs to pharmacies located in several countries, including the United States. In addition to its facilities in Canada, Medisca maintains a facility in the Northern District of New York, specifically, Plattsburg, New York.

7.     Defendant Larry Harney is an employee at Medisca who, upon information and belief, is domiciled in Clinton County, New York.

8.     Defendant Kayla Frenyea is an employee at Medisca who, upon information and belief, is domiciled in Clinton County, New York.

9.     Defendant Kendall Fenton is an employee at Medisca who, upon information and belief, is domiciled in Clinton County, New York.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Woods's claims pursuant to 28 U.S.C. § 1343, as Woods has asserted claims that arise under federal laws of the United States. This Court has supplemental jurisdiction over Woods's state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to federal claims in this action such that they form part of the same case or controversy.

11.     Venue is proper in the Northern District of New York pursuant to 29 U.S.C. § 1391(b)(2) as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.     On April 7, 2022, Woods filed a timely Charge of Discrimination ("Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging claims under Title VII. The EEOC has not yet issued Woods a Notice of Right to Sue. After the EEOC issues a Notice

of Right to Sue, Woods will seek to amend this Complaint to include causes of actions under Title VII.

## FACTUAL ALLEGATIONS

### *Factual Background*

13.     Woods began working for Medisca as a packing technician on September 5, 2019, reporting to Frenyea. Woods also reported to Ariel Hicks, Frenyea's assistant. In this capacity, Woods packaged chemicals for distribution and handled routine lab cleaning and maintenance.

14.     Woods took great pride in her work, particularly in light of the COVID-19 pandemic, and excelled at it from the start. She always accomplished her tasks in a timely and exemplary fashion and as a result, she quickly earned a reputation as a top performer.

15.     While the Company did not provide formal performance appraisals, Medisca regularly informed Woods that her work either met or surpassed expectations. Indeed, Woods was never counseled on any performance deficiencies.

16.     Woods's stellar performance was evidenced by the merit-based salary increases she received in or about October 2019, March 2021, and September 2021.

17.     Indeed, Medisca provided Woods with a merit-based salary increase one month before she formally complained to HR of gender discrimination; two months after that, Woods was terminated.

18.     Medisca's Plattsburgh location is separated into three buildings: (1) the Main Building, which is predominantly used for packaging chemicals; (2) Building Five, a mixed-use facility for packaging and storage, and (3) Building Ten, which is predominantly used for storage.

19.     Throughout most of her employment, Woods worked in the Main Building and occasionally worked in Building Five.

20.     There is a high turnover rate among packing technicians at Medisca, but on average, Woods worked with approximately thirteen other packaging technicians at any given time.

21.     The Main Building and Building Five each have a "Lead Hand," which is a packing technician who maintains a managerial capacity over the other packing technicians. Tanya Girad was the Lead Hand in Building Five throughout Woods's employment, and Sara Acors was the Lead Hand of the Main Building until in or about October 2021. In or about October 2021, Hicks was promoted to Lead Hand of the Main Building.

22.     Lead Hands, along with Frenyea, handled the scheduling of packing technicians and assigned 1-3 technicians per lab daily.

*McCray – Sexual Harassment*

23.     In or about November 2019, Medisca hired Norman McCray as a packaging technician in the Main Building.

24.     Soon after McCray started, Woods noticed that McCray was inappropriately fixated on her and would often question her about her partner and romantic relationship.

25.     In January 2020, Woods complained to Frenyea about McCray, stating that he was "flirting with [her] and making [her] uncomfortable." Woods then requested not to be assigned to the same lab as McCray.

26.     Frenyea acknowledged McCray's peculiar behavior but dismissed the protected complaint, glibly stating: "He makes all of us uncomfortable."

27.     Upon information and belief, Frenyea did not escalate Woods's complaint to HR or take any remedial action whatsoever.

28.     Frenyea stated she would "try" to avoid assigning Woods with McCray, but made no promises and Woods continued to be assigned with McCray. As a result, Woods was continually subjected to McCray's sexual advances and leering, as well as probing questions about her personal life, her sex life and her relationships.

29.     In August 2020, Woods ended her romantic relationship with her partner. Naturally, Woods was upset about the breakup and occasionally appeared so at work, which prompted questions from her coworkers. However, Woods took great efforts to keep her personal and professional life separate and not let on that her relationship had ended.

30.     Unfortunately, despite her best efforts, her coworkers discovered the end of her relationship through social media and gossiped about it, which triggered McCray's immediate attention.

31.     Days later, packaging technician Aleshia McGarvey approached Woods and informed her that McCray had openly discussed how his pregnant wife was "bedridden and can't have sex," and had then abruptly begun talking about Woods, claiming: "she loves working with me" and that "she can't wait until the next time we work together."

32.     Later that month, over Woods's objection, Woods and McCray were again assigned to work together. McCray informed Woods that he was aware of her breakup and began inquiring about the relationship and her romantic interests going forward.

33.     Woods responded that she did not want to talk about personal life at work.

34.     Days later, when the two were again assigned to work alone together, McCray recounted lurid details of his sex life, telling Woods that he attended "sex parties," had "sex with

over two hundred people" and that his wife "knows I cheat but she doesn't know about the threesomes."

35.     After approximately 20 minutes of lurid and unwelcome sexual commentary, McCray leaned closer to Woods, asked her where she lived, and demanded: "How many people have you had sex with?"

36.     Woods was stunned and terrified. Woods is approximately 5' 1" and 120 pounds, while McCray is approximately 5' 9" and 190 pounds. Woods knew that McCray could easily overpower her if he decided to sexually assault her.

37.     With all the courage she could muster, Woods responded that she felt McCray was being "inappropriate" and that she didn't want to talk about her sex life.

38.     Following this encounter, McCray continued to brag to coworkers that Woods "enjoy[ed]" being around him.

39.     Later that month, in late August 2020, Woods begged Frenyea for help and reiterated that McCray's "flirting" was "inappropriate" and making her "feel uncomfortable." Frenyea admitted she had noticed this flirting and that it was indeed inappropriate, but she insisted that Woods should handle it herself.

40.     Woods then reported McCray's sexual remarks to Acors, who responded that if Frenyea wasn't willing to escalate the complaints to HR, she was not willing to go over Frenyea's head.

41.     In September 2020, Woods discovered she was pregnant. Woods experienced concurrent feelings of joy and worry, as she had previously suffered a miscarriage and was not sure if she would be able to carry her baby to term.

42.     As such, Woods kept the news mostly private, only sharing her pregnancy with a few coworkers she trusted.

43.     That same month, due to unrelated operational changes at Medisca, Woods was moved to Building Five. Woods was relieved that the reassignment temporarily abated McCray's access to her. However, McCray still frequently harassed Woods whenever they were together at the workplace.

44.     In or about October 2020, McCray learned that Woods was pregnant, and that she had previously suffered a miscarriage. McCray thereafter began discussing miscarriages with Woods in a perverse attempt at flirtation.

45.     In January 2021, Woods was informed that she would be transitioned back to the Main Building in March 2021.

46.     On January 19, 2021, Woods went into labor and suffered a miscarriage. While at the hospital, Woods fielded a number of distressing text messages from Hicks and Acors including "is his heart still beating," "they can stop labor with shots…keep him in there till he's further along" and "fight hard for your boy!" Woods responded to both Hicks and Acors asking them to stop and telling Acors the messages were "harassing."

47.     That day, Woods commenced medical leave, which lasted until February 28, 2021.

48.     Upon information and belief, during her leave, Hicks and Acors informed several employees at Medisca, including McCray, that Woods had suffered a miscarriage. Upon her return to work, Woods learned that her miscarriage was being openly discussed by her coworkers.

49.     On March 1, 2021, Woods met with Frenyea and requested she not be placed in the same lab as McCray, given his history of sexually harassing her. Woods detailed each and every lewd sexual comment McCray had made to her and stated she did not "feel safe" working with him.

50.     Furthermore, Woods informed Frenyea that McCray had made comments regarding her previous miscarriage and that she did not have the emotional bandwidth to handle similar comments following her latest miscarriage.

51.     Woods pleaded to Frenyea: "He will talk about my miscarriage, and I will cry."

52.     Frenyea callously responded: "[McCray] is just weird and different" and that Woods should "just tell him [not] to talk about [her miscarriage]."

53.     Frenyea added that she would assign a third person to work with Woods and McCray to discourage McCray from harassing Woods any further.

54.     Days later, Woods was assigned to work with McCray and another packing technician, Tod Golden. Woods spent the entire workday evading McCray's leery glances and attempts to make conversation.

55.     This was unsuccessful; as Woods had feared, McCray approached her and began to discuss her second miscarriage, which caused Woods substantial emotional distress.

56.     At the end of the day, Frenyea pulled Woods aside and asked her how she was doing. Woods truthfully responded that the day had been very uncomfortable, that McCray was still making inappropriate remarks and distracting her from her work. Frenyea replied that Woods's "refusal to work with [McCray was] making everyone's job harder."

57.     Woods realized that lodging further complaints would not help her, and would likely result in retaliation, so in order to avoid termination she complied and continued working with McCray.

58.     Woods began dreading each workday, and for the rest of her Medisca employment she was wracked with fear and anxiety as she endured McCray's offensive comments and sexual advances daily.

59.     For example, in late March 2021, in front of several other employees, McCray told Woods that New York needed to "legalize public masturbation" so he could "enjoy himself while grocery shopping."

60.     As a further example, in the Fall of 2021, McCray commented on another packing technician, Kelly Quinn, stating he was "trying to focus on [his] job but [Quinn's] big tits are distracting."

**Fenton – Sexual Harassment and Assault**

61.     Unfortunately, McCray was not the only man at the Company who made flagrant and offensive sexual remarks to women. In fact, male employees routinely acted in an offensive and discriminatory manner and Medisca condoned this behavior.

62.     Packing technician Kendall Fenton openly remarked about women's bodies in the workplace, often stating his preference that women be "skinny" and "petite."

63.     Fenton's comments offended many, including packaging technician Amy Cane, who told Woods that Fenton was "scary" and reminded her of a "predator you would see [in a] true crime" television show.

64.     In April 2021, Fenton was assigned to work in the Main Building, allowing him access to Woods.

65.     On or about June 16, 2021, Woods was assigned to work with Fenton. This was the second time the two had worked alone together.

66.     During work, Fenton began telling Woods about his previous sexual relationships.

67.     Fenton then walked over to Woods and grabbed her shoulders from behind. Woods recoiled at Fenton's touch, but he would not release his grip and she was trapped between him and her long worktable.

68.     Fenton then began rubbing Woods's shoulders while continuing his sexual remarks, including how he had "persuaded" a young woman practicing celibacy to "have sex with [him]," how he had "sex with a girl in a wheelchair," and how he got another woman pregnant and "made her have an abortion."

69.     Fenton then stated that if he had known that Woods "was going through a breakup" in August 2020, he "would have dated [her]." Woods responded that she was not interested in dating him and did not want to talk about dating at work.

70.     With Woods pinned between himself and the worktable, Fenton then began to discuss an erectile dysfunction medication he had been tasked with packaging in a previous job. He then thrust his crotch onto Woods's backside, grinding his penis into her buttocks, and asked: "***Do you think the medication worked?***"

71.     Throughout this assault, Woods was trapped between her worktable and Fenton as he thrusted his groin into her buttocks.

72.     Eventually, Fenton began to laugh and returned to his workstation.

73.     Woods felt utterly violated, humiliated and dehumanized. She was also in shock, unable to comprehend that a coworker would so brazenly sexually assault her in the workplace.

11

74.     Bewildered and terrified, Woods froze at her station and silently completed her day's work.

***Woods Reports the Assault And is Scolded; Harassment and Inaction Persist***

75.     Less than one week later, on or about June 21, 2021, Woods summoned the courage to inform Frenyea that during work Fenton had acted inappropriately towards her and she did not feel safe working alone with him. This was especially difficult for Woods to tell Frenyea because Fenton was Frenyea's ex-boyfriend.

76.     Woods then explained to Frenyea that the consistent barrage of sexual harassment was creating a hostile work environment, adding that the abuse by Fenton mirrored the abuse she had suffered by McCray.

77.     Frenyea admonished Woods that Fenton was "a nice guy" and asked Woods, "why are you so obsessed with [McCray]?" Woods responded that she was not "obsessed" with McCray, but that she was being sexually harassed and trying to report said harassment.

78.     Frenyea responded that she and Fenton had "dated in high school," that they had known each other for approximately five years, and Fenton just had a "weird humor." Frenyea ended the conversation by telling Woods she needed to stop making complaints of harassment.

79.     Woods felt hopeless, as Frenyea had become completely hostile to her complaints.

80.     Convinced that Medisca would never help her, Woods left the conversation feeling defeated and emotionally distraught.

81.     Shortly after the assault, Fenton was reassigned to work as a quality technician, and was one of several employees tasked with performing "clean audits" of Medisca's labs.

82.     Over the following months, whenever Woods requested a clean audit for her lab, Fenton would go out of his way to volunteer in an effort to be close to Woods.

83.      In the same vein as McCray, Fenton directed a slew of probing questions to Woods about her romantic interests and relationship status.

84.     While a clean audit should only take two to three minutes, Fenton would stay in the lab up to fifteen minutes either trying to engage in unsolicited small talk with Woods or ogling her breasts and buttocks.

85.     To avoid Fenton, Woods often left her lab during the audit and waited in the Company's locker room until Fenton was gone. When this was not possible, Woods would strategically position herself in the lab as far away from Fenton as possible, terrified that he would assault her again.

86.     Woods's coworkers noticed Fenton's obsession with her, including Frenyea. By way of example only, during one of Fenton's audits of Woods's lab, Hicks commented that "this audit is taking quite a bit of time." Afterward, Hicks informed Woods that she had intervened because "[Frenyea] noticed the audit was taking an extensive amount of time and sent [Hicks] to get [Fenton] to leave."

***Woods Commences FMLA Leave and Lodges Formal HR Complaint***

87.     Meanwhile, Woods's mother's health had been rapidly deteriorating due to severe osteoarthritis which put the vertebrae in her lower back out of alignment, requiring two separate back surgeries.

88.     Following her mother's second surgery, Woods decided to take FMLA leave to take care of her mother.

89.    In May 2021, Woods completed and submitted all of the requisite FMLA paperwork to take FMLA leave from June 15 to December 15.

90.    However, Frenyea made it clear that she resented Woods's choice to avail herself of her FMLA rights.

91.    Throughout the first two weeks of June 2021, Frenyea repeatedly pressured Woods to cancel her FMLA leave, stating, *inter alia*, "we are really low on workers," "we are understaffed," and "people are already out because of covid." Frenyea also pointedly asked Woods if she "really" needed to take FMLA leave, if there was anyone else who could help Woods's mother, if she could work half days and if she could "make meals in advance so [her mother could] help herself."

92.    Woods felt pressured; concerned that she would lose her job, she ultimately altered her FMLA leave to accommodate Medisca's schedule, only taking sporadic short term leave instead of the long-term leave she had originally planned.

93.    Throughout the summer and into the Fall of 2021, Woods was routinely sexually harassed by Fenton and McCray, as described above, resulting in severe emotional distress.

94.    On October 29, 2021, this distress culminated in Woods breaking down in tears at work. Hicks attempted to console Woods and asked her what was wrong. Woods informed Hicks that she was regularly sexually harassed at work and Medisca was doing nothing to help her.

95.    Hicks related with Woods's experience, sharing that McCray had commented Hicks had "the biggest tits in the facility." Hicks said she had immediately reported the harassment to Debra Dragoon, Supervisor of Quality.

14

96.     That same day, Dragoon asked Woods to accompany her to her car where the two discussed Woods's experience at Medisca. In this conversation, Woods informed Dragoon of the sexual harassment she had been enduring, including the sexual assault by Fenton.

97.     Dragoon responded that she had observed McCray being inappropriate at work and was shocked that Frenyea had not escalated Woods's complaints to HR. Dragoon then informed HR of Woods's complaints.

98.     Later that day, Lead Hand Tanya Girad met with Woods and told her she was "so sorry this keeps happening."

99.     In a call later that day, HR instructed Woods to take the following day off, and that they would commence an investigation regarding her complaints.

100.    Given that Woods's work environment had become intolerable, and her mother's health was dire, Woods commenced a longer-term continuous FMLA leave on October 29 and was scheduled to return on December 7.

101.    Six days after Woods began her FMLA leave, on November 5, 2021, HR Specialist Renée Walker called Woods to discuss her latest sexual harassment complaint. Walker informed Woods that the investigation would be closed with a finding of no wrongdoing by McCray or Fenton.

102.    Walker admitted that the finding was based solely on an alleged lack of evidence due to the destruction of video footage which would have captured the sexual assault. Walker claimed that the video footage system autodeletes every 90 days, and the footage was destroyed before HR was put on notice of Woods's claims.[1]

---

[1] Woods complained about the incident to Frenyea within one week of its occurrence, giving Medisca ample time to obtain and preserve the footage of her assault. Moreover, Woods made numerous protected complaints of sexual

15

103.    Walker did not indicate that any other investigatory steps were taken to investigate Woods's complaints. In fact, Walker stated Frenyea was unwilling to speak to or investigate key players, including McCray or Fenton.

104.    Walker stated Medisca would not take any steps to remedy Woods's work environment or counsel and/or discipline McCray or Fenton because doing so would "cause more legal trouble" for Medisca.

105.    Instead, Walker stated that Woods's protected complaints of sexual assault were in "violation of Medisca's Code of Conduct," and that she would be disciplined if she made additional complaints.

106.    Walker then proposed that Woods accept a demotion to shipping, for significantly less pay, in order to get away from Fenton and McCray. Unable to accept a pay cut, Woods rejected this offer of demotion.

107.    Later that day, Walker emailed Woods memorializing the conversation.

108.    In the email, Walker reiterated that any future complaints by Woods would be viewed as an inappropriate violation of Medisca's Code of Conduct.

109.    In that same email, Walker characterized Woods's complaints as "[im]mature and [un]professional," as failing to treat McCray and Fenton with "respect," "false or deceptive," "malicious gossip," "rumors," and a "disturbance" for other employees.

110.    Walker concluded the email threatening that upon Woods's return to work "sending emails, texts, or having conversation with employees stating that colleagues at

---

harassment in the lab for months before the assault. At best, Medisca consciously and deliberately ignored Woods's complaints of sexual harassment and sexual assault and allowed the footage to be destroyed.

Medisca…sexually assaulted [Woods] must stop immediately" and that "***any further instances of this will result in disciplinary action.***"

111.   Woods was devastated; after speaking with Dragoon she had become hopeful that HR would protect her after all, but now those hopes were gone and she had nowhere else to turn.

112.   Woods was also terrified given the lack of assurances regarding her work environment when she returned to work, so she called Frenyea to make a plan about her return to work.

113.   Frenyea denied having told HR that she was not willing to interview the key players involved in Woods's complaints and stated that in fact, HR had not instructed her to interview anyone or investigate anything.

114.   Regarding her return to work, Frenyea stated she could not ensure that Woods's environment would be any different than it was when she left. Woods impressed upon Frenyea her fear of further sexual assault and harassment upon returning to work. Frenyea responded, "then I need to know what you are doing," insinuating that Woods should not return at all.

115.   Frenyea ended the call by stating that Woods should contact Larry Harney, General Manager of US Operations, "and ask what [her] options are."

116.   Woods called Harney and tried to express her concerns regarding the sexual harassment." In response, Harney encouraged Woods to resign, sneering: "Are you quitting? I want to call HR and let them know!" Harney then bragged that "Medisca never denies unemployment."

***Return to Work***

117.    On December 7, 2021, Woods returned to work and waited outside of Frenyea's office for a directive on where to go. After several minutes, Woods asked Hicks for her assignment for the day.

118.    Hicks did not have an answer and advised Woods to go into Frenyea's office to ask her directly. Woods did as instructed. To her distress, Woods entered Frenyea's office to find Frenyea sitting with McCray.

119.    Woods was struck with an acute sense of fear and panic; she quickly excused herself and ran to the nearest restroom to collect herself.

120.    To her further distress, when Woods left the restroom she encountered Fenton. It was clear that Medisca had taken no steps whatsoever to address the hostile work environment or put any distance between Woods and her two harassers.

121.    Without stating a word, Woods rushed past Fenton and into the women's locker room to try again to collect herself. Frenyea approached Woods while she was in the locker room and Woods immediately requested that she be moved to Building 5.

122.    Frenyea did not respond to the request and asked Woods if she was "ready." Woods understood Frenyea to be asking if she was ready for her work assignment. Woods responded in the affirmative, put her things in her locker, and left the locker room with Frenyea.

123.    Once Frenyea and Woods left the locker room, Frenyea stated that Woods needed to speak with Harney regarding her complaints.

124.    Woods was frightened as Harney had already made clear that he wanted her to quit. He also generally communicated in a crass and aggressive fashion and Woods already felt

vulnerable, having been confronted with both of her harassers within an hour of her return to work.

125.    Woods again asked Frenyea for a work assignment, and again Frenyea replied that Woods had to meet with Harney immediately before she could work. Woods asked that the meeting be postponed, but Frenyea replied that it could not wait.

126.    Woods pleaded with Frenyea, stating she would likely become upset if she had to meet with Harney and that crying made it difficult to wear the respirator mask required in the lab.

127.    Fearing termination, Woods also told Frenyea she needed to be able to work and earn her salary. Frenyea nevertheless insisted that the meeting happen immediately.

128.    Frenyea then called out to Harney, who emerged from his office and instructed Woods to come inside with him.

129.    This exchange was noticed by Todd Golden and Kelly Quinn, who appeared concerned given they were both aware – along with many other packing technicians at this point – that Woods was being sexually harassed, had made several complaints of harassment and had suffered retaliation by Medisca because of those complaints.

130.    Noticing the concerned expression on Golden's and Quinn's faces, Harney yelled out "hey Todd how's it going" and "doing good today, Kelly?" Golden and Quinn responded that they were okay and hurried away into Medisca's lab.

131.    Harney again, summoned Woods into his office. Woods walked up the stairs and entered Harney's office. Harney then yelled out to Frenyea to come in and join the meeting. Frenyea did as Harney instructed.

132.    Woods began by telling Harney that she needed her job and that she could not survive without her salary. Harney responded that he was not denying her work.

133.    Woods then asked if she could return to the lab and start her workday. Harney responded she could after the meeting.

134.    Woods attempted to explain to Harney and Frenyea that she had been treated unfairly, that she did not "feel safe at work" and that she "deserve[s] to be protected at work because [she has] rights."

135.    In response, Harney became defensive and declared: "I create a safe environment!" Woods started to reply, "you have not…" but Harney interjected and screamed "don't speak over me!"

136.    Harney then blamed Woods for the sexual harassment, stating she should have gone to HR sooner so that they could have helped her and that they had "done everything that [they] could." Woods responded that she had made several prior complaints of harassment to Frenyea, her direct supervisor, to no avail.

137.    Woods then objected to the retaliation threats, stating "it's unfair that I get an email from HR saying that I can't talk about the situation at work or there will be disciplinary action."

138.    Woods continued that the Company had not done enough to investigate her claims or remediate her work environment. As Woods spoke, she observed Harney growing ever more incensed, until he suddenly screamed:

**"That's it, you're fired for making accusations! Clock out, get your stuff, leave the building and do not return!"**

139.    Woods replied that she had not even been allowed to clock in yet. Harney stood over Woods and screamed down at her: "Yes! Even better! Get your stuff, leave the building and do not return!"

140.    At this point, Harney's face was bright red with rage, and Woods was terrified.

141.    Woods stood up and headed to the door. Harney followed closely behind Woods. Woods feared Harney would attack her.

142.    Harney followed Woods out of his office and down the stairs as she headed to her locker room to collect her things. At the bottom of the stairs, Woods dropped her lab coat. Harney stepped over the coat and kept his pace directly behind Woods, following her so closely that she could hear Harney's heavy breathing in her ear.

143.    As Woods turned the corner, she could see Golden watching her and Harney from the lab.

144.    Harney followed closely behind Woods until she reached the women's locker room and went inside. Harney did not enter the woman's locker room. Instead, he stood outside the door and stared at Woods inside the locker room as she collected her things.

145.    Woods began to panic. She was confused and frightened by Harney's behavior. As Woods left the woman's locker room, she began to run in an attempt to escape Harney. Shockingly, Harney ran after Woods and literally chased her out of the building.

146.    Once Woods made it through the front door and out of the building, Harney grabbed the front door from inside and loudly slammed it shut.

147.    Having been berated, fired and chased out of the building, Woods stood in the parking lot for approximately five minutes, frozen in utter shock. After she was able to collect herself, she got into her car and drove home.

148.    The next day, Woods was shocked to receive an email from Walker stating it was intended to "confirm" that HR had received notification from Harney and Frenyea that Woods had "verbally resigned [her] employment."

149.    Woods was stunned that Medisca would attempt to create a false paper trail supporting the lie that she had quit, when she had been explicitly terminated in retaliation for her complaints of discrimination and then chased out of the building into the parking lot.

**_Effect on Woods_**

150.    The hostile environment Woods suffered combined with the subsequent loss of her livelihood have had a devastating impact on Woods both financially and emotionally.

151.    Woods has suffered from long periods of crying; feelings of depression, hopelessness, anxiety, shame and humiliation; loss of interest in activities she once enjoyed, panic attacks, nightmares, sleeplessness and terror. Woods has also developed a fear of men, based on the ever present worry that they will assault or otherwise mistreat her in the same fashion as the men of Medisca.

152.    To address the substantial emotional distress caused by the Company's cruel and unlawful treatment of her, Woods has obtained mental health treatment from a licensed psychotherapist, who believes Woods is exhibiting symptoms of Post-Traumatic Stress Disorder.

153.    Despite diligent efforts, Woods has been unable to obtain new employment and remains unemployed as of this writing. Woods has therefore lost both her apartment and her car and has had to borrow money from friends and family just to put food on the table.

## FIRST CAUSE OF ACTION:
### Interference in Violation of FMLA
### *Against Medisca, Harney, and Frenyea*

154.    Woods repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

155.    Medisca improperly interfered with Woods's request for FMLA by, *inter alia,* restraining and/or denying her attempts to exercise benefits to which she was entitled under the FMLA.

156.    Harney and Frenyea are personally, directly and individually liable, in that they aided and abetted Medisca in its unlawful interference against Woods, in violation of FMLA.

157.    Alternatively, in terms of the economic realities of the workplace, Harney and Frenyea are personally, directly, and individually liable as employers for the unlawful interference against Woods, in violation of FMLA.

158.    Defendants acted willfully, with malice and/or reckless indifference to Woods's rights under the FMLA, entitling her to an additional award of liquidated damages in an amount equal to 100 percent of her economic damages.

159.    Medisca's unlawful acts caused Woods to suffer economic damages, including lost wages and benefits, as well as emotional and physical distress.

160.    Defendants are jointly and severally liable to Woods for back pay, front pay, emotional distress and other compensatory damages, liquidated damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## SECOND CAUSE OF ACTION:
### Retaliation in Violation of the FMLA
### *Against Medisca, Harney, and Frenyea*

161.    Woods repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

162.    Medisca improperly retaliated against Woods for her request for FMLA by, *inter alia*, terminating her employment after taking FMLA leave.

163.    Harney and Frenyea are personally, directly and individually liable, in that they aided and abetted Medisca in its unlawful retaliatory acts against Woods, in violation of FMLA.

164.    Alternatively, in terms of the economic realities of the workplace, Harney and Frenyea are personally, directly, and individually liable as employers for the unlawful retaliation against Woods, in violation of FMLA.

165.    Defendants acted willfully, with malice and/or reckless indifference to Woods's rights under the FMLA, entitling her to an additional award of liquidated damages in an amount equal to 100 percent of her economic damages.

166.    Medisca's unlawful acts caused Woods to suffer economic damages, including lost wages and benefits, as well as emotional and physical distress.

167.    Defendants are jointly and severally liable to Woods for back pay, front pay, emotional distress and other compensatory damages, liquidated damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### THIRD CAUSE OF ACTION:
### Discrimination in Violation of the NYSHRL
### *Against Medisca, Harney, and Frenyea*

168.    Woods repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

169.    Medisca unlawfully discriminated against Woods in the terms and conditions of her employment by, *inter alia*, subjecting her to disparate working conditions on the basis of her sex in violation of the NYSHRL.

170.    Harney and Frenyea are personally, directly and individually liable, in that they aided and abetted Medisca in its unlawful discriminatory acts against Woods, in violation of NYSHRL § 296 (6).

171.    Alternatively, in terms of the economic realities of the workplace, Harney and Frenyea are personally, directly, and individually liable as employers for the unlawful discrimination against Woods, in violation of NYSHRL § 296(1).

172.    Medisca's unlawful discriminatory acts caused Woods to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

173.    Medisca acted willfully, with malice and/or reckless indifference to Woods's rights, entitling her to an award of punitive damages.

174.    Medisca, Harney, and Frenyea are jointly and severally liable to Woods for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

## FOURTH CAUSE OF ACTION:
### Retaliation in Violation of the NYSHRL
### *Against Medisca, Harney, and Frenyea*

175.    Woods repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

176.    Medisca unlawfully retaliated against Woods in the terms and conditions of her employment and terminated her employment on the basis of race, in violation of NYSHRL.

177.    Harney and Frenyea are personally, directly and individually liable, in that they aided and abetted Medisca in its unlawful retaliatory acts against Woods, in violation of NYSHRL § 296 (6).

178.    Alternatively, in terms of the economic realities of the workplace, Harney and Frenyea are personally, directly, and individually liable as employers for the unlawful retaliation against Woods, in violation of NYSHRL § 296 (1).

179.    Medisca's unlawful retaliatory acts caused Woods to suffer economic damages, including lost wages and benefits, as well as emotional distress damages.

180.    Medisca acted willfully, with malice and/or reckless indifference to Woods's rights, entitling them to an award of punitive damages.

181.    Medisca, Harney, and Frenyea are jointly and severally liable to Woods for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, cost and disbursements.

## FIFTH CAUSE OF ACTION:
**Assault and Battery**
*Against Fenton*

182.    Woods repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

183.    By his conduct, as described herein, Fenton sexually assaulted and battered Woods. Fenton intentionally touched or applied force to Woods, in a harmful or offensive manner, and without her consent.

184.    As a result of said conduct, Woods suffered injury and experienced emotional suffering and distress, mental anguish, loss of enjoyment of life, humiliation, embarrassment, and economic damages.

185.    In addition to being intentional and deliberate, Fenton's sexual assault and battery of Woods has the character of outrage associated with crime, thereby entitling Woods to an award of punitive damages.

186.    Therefore, Fenton is liable to Woods for emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

## SIXTH CAUSE OF ACTION:
### False Imprisonment
#### *Against Fenton*

187.     Woods repeats and realleges each and every allegation set forth above with the same force and effect as if fully set forth herein.

188.     Fenton intentionally, unlawfully and falsely imprisoned Woods in between himself and her workstation when he sexually assaulted and battered her.

189.     Woods did not consent to this confinement, which was not otherwise privileged.

190.     In addition to being intentional and deliberate, Fenton's unlawful imprisonment of Woods has the character of outrage associated with crime, thereby entitling Woods to an award of punitive damages.

191.     Therefore, Fenton is liable to Woods for emotional distress and other compensatory damages, punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, costs and disbursements.

### DEMAND FOR RELIEF

WHEREFORE, it is respectfully requested that the Court enter judgment for Woods and against Defendants:

a)     on the First and Second Cause of Action, awarding economic damages, compensatory damages, liquidated damages, attorneys fees, interest, and costs in amount to be determined by the finder of fact;

b)     on the Third and Fourth Cause of Action, awarding economic damages, compensatory damages, punitive damages, attorneys fees, interest, and costs in amount to be determined by the finder of fact;

c)      on the Fifth and Sixth Cause of Action, awarding compensatory damages,

punitive damages, attorneys fees, interest, and costs in amount to be determined by the

finder of fact; and

d)      such other relief as may be just.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Woods demands a trial by jury.

Dated: Brooklyn, New York
         June 7, 2022

Respectfully submitted,

Travis Pierre-Louis
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
travis@crumiller.com
Attorneys for Plaintiff